IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:24-CV-00837-KDB-DCK

| | |
|---|---|
| JONATHAN FISHER AND BLAIR ARTIS,<br><br>Plaintiffs,<br><br>v.<br><br>GARDAWORLD CASH SERVICE INC.,<br><br>Defendant. | **MEMORANDUM OF DECISION AND ORDER** |

**THIS MATTER** is before the Court on Defendant GardaWorld Cash Service, Inc.'s ("GardaWorld") Motion to Dismiss Plaintiffs' Amended Complaint (Doc. No. 20). The Court has carefully considered this motion and the parties' briefs and exhibits.[1] For the reasons discussed below, the Court will **GRANT** in part and **DENY** in part the motion.

I.      LEGAL STANDARD

A.      12(b)(1) Subject Matter Jurisdiction

A motion to dismiss based on Federal Rule of Civil Procedure 12(b)(1) addresses whether the court has subject matter jurisdiction to hear the dispute, and Plaintiff bears the burden of proving subject matter jurisdiction exists. *Evans v. B. F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir.

---

[1] When deciding a motion to dismiss, "a court may consider the pleadings and any materials 'attached or incorporated into the complaint" without converting the motion to dismiss into a motion for summary judgment so long as they are integral to the complaint and authentic. *Fitzgerald Fruit Farms LLC v. Aseptia, Inc.*, 527 F. Supp. 3d 790, 796 (E.D.N.C. 2019) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). In addition, "courts are permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015).

1

1999). "[F]ederal courts are courts of limited jurisdiction, constrained to exercise only the authority conferred by Article III of the Constitution and affirmatively granted by federal statute." *In re Bulldog Trucking, Inc.*, 147 F.3d 347, 352 (4th Cir. 1998) (quotation omitted); *see Gunn v. Minton*, 568 U.S. 251, 256 (2013); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "[W]hen a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the trial court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). But there is no presumption that a federal court has subject matter jurisdiction, *Pinkley, Inc. v. City of Frederick*, 191 F.3d 394, 399 (4th Cir. 1999), and if the Court determines it lacks subject matter jurisdiction, it must dismiss the case. Fed. R. Civ. P. 12(h)(3).

B.  **12(b)(6) Failure to State a Claim**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted" tests whether the complaint is legally and factually sufficient. See Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 566 U.S. 30 (2012). A court need not accept a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The Court, however, accepts all well-pled facts as true and draws all reasonable inferences in Plaintiff's favor. *See Conner v. Cleveland Cty., N. Carolina*, No. 19-2012, 2022 WL 53977, at *1 (4th Cir. Jan. 5, 2022); *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440.

In so doing, the Court "must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Pa. Nat'l Mut. Cas.*

2

*Ins. Co. v. Beach Mart, Inc.*, 932 F.3d 268, 274 (4th Cir. 2019). Construing the facts in this manner, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Pledger v. Lynch*, 5 F.4th 511, 520 (4th Cir. 2021) (quoting *Ashcroft*, 556 U.S. at 678). Thus, a motion to dismiss under Rule 12(b)(6) determines only whether a claim is stated; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

## II. ERISA'S STATUTORY AND REGULATORY FRAMEWORK

ERISA expressly prohibits group health plans from charging higher premiums or contributions based on health status. 29 U.S.C. § 1182(b)(1) (a plan "may not require an individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual … on the basis of any health status-related factor …"). Health status-related factors include overall health status, medical conditions, receipt of health care, and medical history. 29 U.S.C. § 1182(a)(1)(A)–(B), (D)–(E). However, it is permissible to establish premium discounts and rebates (or the ability to avoid surcharges) in return for "adherence to programs of health promotion and disease prevention." § 1182(b)(2)(B); 29 C.F.R. § 2590.702(f)(1)(i). *See also* § 2590.702(c)(3), (f), (f)(1)(iii) ("a plan or issuer may vary the amount of premium or contribution it requires similarly situated individuals to pay based on whether an individual has met the standards of a wellness program," which includes outcome-based and activity-based wellness plans). Programs of health promotion and disease prevention include tobacco-free programs and vaccine programs.

"In 2010, Congress amended the Public Health Safety Act ("PHSA") to add wellness program requirements and specifically incorporated Section 2705 of the PHSA into ERISA." *Bokma v. Performance Food Grp., Inc.*, No. 3:24CV686 (DJN), 2025 WL 1452042, at *1 (E.D.

Va. May 20, 2025) (citing 29 U.S.C. § 1185d(a)(1))) (PHSA provisions "apply to group health plans" which fall under ERISA). PHSA Section 2705 requires wellness programs offered by employers to "be reasonably designed to promote health or prevent disease," allow "individuals eligible for the program the opportunity to qualify for the reward … at least once each year;" make available the "full reward" to all similarly situated individuals; and "disclose in all plan materials describing the terms of the wellness program the availability of a reasonable alternative standard." 42 U.S.C. § 300gg-4(j)(3)(B)–(E).

"In 2013, the Department of Labor ("DOL") incorporated these requirements into its regulations." *Bokma,* 2025 WL 1452042, at *2 (citing Incentives for Nondiscriminatory Wellness Programs in Group Health Plans, 78 Fed. Reg. 33158, 33181–86 (June 3, 2013) (codified at 29 C.F.R. § 2590.702)). In so issuing, the DOL emphasized "every individual participating in [a wellness] program should be able to receive the full amount of any reward or incentive, regardless of any health factor." *Id.* at *2 (quoting *id.* at 33160). Among other things, the regulation explained that wellness programs (including outcome- and activity-based wellness programs) meeting specific requirements fall under an "exception to the general prohibitions against discrimination." § 2590.702(f), (f)(1)(iv)–(v).

### A. Outcome-Based Wellness Programs

An outcome-based wellness program is "a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking …) in order to obtain a reward." § 2590.702(f)(1)(v). For individuals who "do not attain or maintain the specific health outcome, compliance with an educational program [such as a smoking cessation program] … may be offered as an alternative to achieve the same reward." *Id.* In the context of a tobacco-free program, the "reward" may include the avoidance of a surcharge for tobacco use.

4

Outcome-based wellness programs, including tobacco cessation programs, must satisfy five conditions under the applicable regulation. *Bokma*, 2025 WL 1452042, at *2. First, individuals "must receive at least one opportunity per year to qualify for the reward." *Id.* (quoting § 2590.702(f)(4)(i)); *see also* § 300gg-4(j)(3)(C). "Second, the reward must not exceed a specified percentage of the 'cost of employee-only coverage under the plan.'" *Id.* (quoting § 2590.702(f)(4)(ii)). "Third, the program 'must be reasonably designed to promote health or prevent disease.'" *Id.* (quoting § 2590.702(f)(4)(iii)).

Fourth, "[t]he full reward ... must be available to all similarly situated individuals," which requires a "reasonable alternative standard [or waiver] ... for any individual who does not meet the initial standard." *Id.* (quoting § 2590.702(f)(4)(iv)(A)); *see also* § 300gg-4(j)(3)(D). "The plan must also accommodate the recommendations of an individual's personal physician if that physician deems a plan standard 'not medically appropriate for that individual.'" *Id.* (quoting § 2590.702(f)(4)(iv)(C)); *see also* § 300gg-4(j)(3)(D)(ii). Finally, fifth, the plan must "disclose in all plan materials [and 'in any disclosure that an individual did not satisfy the initial outcome-based standard'] describing the terms of an outcome-based wellness program ... the availability of a reasonable alternative standard." § 2590.702(f)(4)(v); *see also* § 300gg-4(j)(3)(E). "This disclosure must include 'contact information for obtaining a reasonable alternative standard and a statement that recommendations of an individual's personal physician will be accommodated.'" *Bokma*, 2025 WL 1452042, at *2 (quoting *id.*) But, if a plan's "materials merely mention that such a program is available, without describing its terms, this disclosure is not required." § 2590.702(f)(4)(v).

B.   Activity-Only Wellness Programs

An activity-only wellness program is a type of "health-contingent wellness program that requires an individual to perform or complete an activity [such as obtaining a COVID-19 vaccination] related to a health factor in order to obtain a reward but does not require the individual to attain or maintain a specific health outcome." § 2590.702(f)(1)(iv). In the context of a vaccine wellness program, the "reward" may include the avoidance of a surcharge for getting vaccinated.

Like outcome-based wellness programs, activity-only programs must satisfy five conditions under the applicable regulation. The first three conditions (frequency of opportunity to apply, reward size, and design reasonability) mirror those in outcome-based wellness programs. *See* § 2590.702(f)(3)(i)–(iii). The fourth condition explains the "full reward ... must be available to all similarly situated individuals," and requires a "reasonable alternative standard [or waiver] ... for any individual for whom … it is unreasonably difficult due to a medical condition to satisfy …the standard," or "for whom … it is medically inadvisable to attempt to satisfy the … standard." § 2590.702(f)(3)(iv)(A)(1)–(2); *see also* § 300gg-4(j)(3)(D)(i)(I)–(II). The plan "must also accommodate the recommendations of an individual's personal physician if that physician deems a plan standard 'not medically appropriate for that individual.'" *Bokma*, 2025 WL 1452042, at *2. *See* § 2590.702(f)(3)(iv)(C)(4). Finally, while the fifth condition requires RAS disclosures otherwise identical to those in outcome-based programs, an employer is *not* required to proactively provide notice of a reasonable alternative standard when disclosing that an individual did not initially satisfy the activity-only standard.

III.   FACTS AND PROCEDURAL HISTORY

Plaintiffs Blair Artis and Jonathan Fisher are residents of Mecklenburg County, North Carolina, and current or former employees of GardaWorld who were enrolled in GardaWorld's

6

employer-sponsored health plan (the "Plan"). Doc. No. 16 (First Amended Class Action Complaint ("FAC")) at ¶ 8. Plaintiffs allege that at all times relevant, GardaWorld maintained and administered the Plan, which included tobacco and vaccine wellness programs. *Id.* at ¶¶ 10, 67.

Pursuant to the Plan's terms, Plaintiffs and other employees were assessed surcharges, which were taken from their paychecks each month, for tobacco use and for failing to obtain vaccination against COVID-19. FAC at ¶¶ 8, 10–11, 28. The Plan required employees to enroll in a smoking-cessation program and provide proof of vaccination (or seek an accommodation) by November 15 (2022) or December 15 (2023–2024) of the year preceding the Plan year to avoid the surcharges. FAC at ¶ 28; Doc. No. 21-1 at 8. Plaintiffs allege they were "unaware of the availability of a reasonable alternative standard ("RAS") or that recommendations from their personal physician would be accommodated," for either program, because the Plan documents lacked the necessary disclosures, although they are required under ERISA. FAC at ¶ 6. However, Plaintiffs concede knowledge of the tobacco-cessation program that would permit avoidance of the tobacco-related surcharge. FAC at ¶ 29. In 2023, the Plan's Benefit Guide stated:

> If you or any of your dependents use tobacco, you will be subject to a monthly surcharge of $100 in addition to the insurance premium cost for medical coverage. To eliminate this surcharge, you must complete a tobacco cessation journey program through the Aetna website and then notify the GardaWorld Cash Benefits Department of your completion. The time is now to say goodbye to tobacco. You'd be amazed at how fast your health can improve once you've quit and how much better you can feel after you do. With the right tips and support, you can break the habit. It's easy to find the Tobacco Focus Journey under the 'Being Tobacco-Free' section. Select the Tobacco Journey that fits your needs and click to get started.

*Id.*

Additionally, employees were required complete a form in GardaWorld's computer system which explained, "Employees … that are not vaccinated [against Covid-19] will incur a … surcharge …. To waive this surcharge, employees must certify they are vaccinated or document

7

the need for an accommodation." Doc. No. 21-1 at 8. Plaintiffs do not dispute viewing or completing the form.

Notably, the FAC contains no indication that Plaintiffs enrolled in the tobacco-cessation program or would have enrolled in it absent the allegedly discriminatory program. Similarly, the record contains no indication either Plaintiff sought an accommodation or that they would have done so but for the allegedly discriminatory program. Instead, Plaintiffs commenced this putative class action asserting globally that GardaWorld's programs failed to satisfy ERISA requirements under § 2590.702 in multiple respects.

Plaintiffs first allege that by failing to offer retroactive refunds of surcharges for employees who satisfy surcharge avoidance requirements after the cutoff but before the end of the Plan year, GardaWorld deprives employees of the "full reward" contemplated by the DOL. FAC at ¶ 34. Relatedly, Plaintiffs claim employees were prevented from earning the "full reward" (which discouraged program participation) because both Plan programs lacked a regulatorily compliant RAS and failed to include notice that the recommendations of an employee's personal physician would be accommodated. FAC at ¶¶ 35–36, 52–54, 59–60.

Plaintiffs further allege GardaWorld breached its fiduciary duties to the Plan "by assessing and collecting the unlawful vaccine and tobacco surcharges in violation of ERISA and the applicable regulations." FAC at ¶ 68. In support, they claim GardaWorld refused to retroactively refund levied surcharges, used the surcharges to "reduce its own obligations to the Plan," used Plan assets for its own benefit, and administered noncompliant programs under the Plan. FAC at ¶¶ 69–72. GardaWorld timely moved to dismiss the FAC. *See* Doc. No. 20. The matter is fully briefed and ripe for this Court's review.

## IV.  DISCUSSION

GardaWorld first argues that the Court should not reach the merits of Plaintiffs' claims because they lack Article III standing.

A.  <u>Article III Standing</u>

GardaWorld claims Plaintiffs have asserted merely "bare procedural violation[s]," suggesting that because Plaintiffs neither claimed to qualify for or seek a RAS under either program, and therefore could not earn *any* reward (i.e., surcharge avoidance) under the Plan, they suffered no cognizable injury. Doc. No. 21 at 12–14. This argument has some merit, because under perfect ERISA and DOL compliance (which the Court does not determine), Plaintiffs would have remained subject to the same tobacco and vaccine surcharges based on the facts alleged.

As noted, ERISA prohibits plans discriminating based on health factors, including tobacco use and vaccination status. However, plans meeting the requirements for outcome- and activity-based wellness programs are exempted from ERISA's anti-discrimination provisions. While not meritless, GardaWorld's argument misinterprets Plaintiffs' position. Plaintiffs assert more than mere procedural violations; they allege the Plan *as written* fails to qualify for the exemption and thus constitutes prohibited discrimination under ERISA and DOL regulations. Moreover, they claim that because the plan is "unlawful," the associated surcharges (which both Plaintiffs claim to have paid) are similarly unlawful.

As an initial matter, there is no ERISA exception to Article III. *Thole v. U. S. Bank N.A.*, 590 U.S. 538, 547 (2020). Therefore, the Court must make the threshold inquiry into determining whether Plaintiffs have "standing" sufficient to assert their claims and support subject matter jurisdiction. The principle of standing originates from Article III of the Constitution, which "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *See*

9

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. CONST. art. III § 2). The standing inquiry examines "whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984); *see Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982) ("The requirements of Art. III are not satisfied merely because a party requests a court of the United States to declare its legal rights ..."). The doctrine encompasses both constitutional requirements and "prudential principles." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979).

Put simply, if a plaintiff lacks standing, then there is no case or controversy, and the court lacks subject matter jurisdiction over the claims. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The "irreducible constitutional minimum" of standing consists of three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.*; *Spokeo*, 578 U.S. 330 at 338. Indeed, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id*. at 341; *TransUnion LLC,* 594 U.S. at 424–425 (to establish injury in fact, plaintiff's allegations must be sufficient to show he suffered a concrete harm); *see Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 192 (2000) (The "[s]tanding doctrine functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a

concrete stake."); *Hensley v. City of Charlotte*, No. 320CV00482KDBDSC, 2023 WL 2533083, at *1–2 (W.D.N.C. Mar. 15, 2023).

A plaintiff bears the burden of establishing standing "for each claim" advanced and "for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Dress v. Cap. One Bank (USA), N.A.*, No. 1:19-CV-00343, 2019 WL 3451304, at *2–4 (E.D. Va. July 30, 2019), *aff'd*, 849 F. App'x 55 (4th Cir. 2021). Also, with respect to putative class actions, the "Supreme Court has made clear that named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976)) (internal quotation marks omitted). In other words, where a named plaintiff in a purported class action cannot establish standing, she cannot "seek relief on behalf of [herself] or any other member of the class." *Warth v. Seldin*, 422 U.S. 490, 502 (1975) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

The Court finds Plaintiffs' argument that they have standing persuasive, as have at least three other courts considering similar arguments. *See Chirinian v. Travelers Companies, Inc.,* No. 24-CV-3956 (LMP/DTS), 2025 WL 2147271, at *5 (D. Minn. July 29, 2025) (finding Article III standing under materially identical circumstances); *see also Mehlberg v. Compass Grp. USA, Inc.*, No. 24-CV-04179-SRB, 2025 WL 1260700, at *3–4 (W.D. Mo. Apr. 15, 2025); *Bokma,* 2025 WL 1452042, at *6. Assuming Plaintiffs are correct on the merits, they have alleged a concrete injury (their surcharge payments) that is traceable to GardaWorld's decision to impose tobacco and vaccine surcharges under a discriminatory ERISA plan, which can be redressed by a refund of the surcharge. Therefore, Plaintiffs have standing.

B.  Breach of Fiduciary Duty (Count III)

Turning to the merits of GardaWorld's challenge to Plaintiffs claims, the Court first considers Plaintiff's allegations of Breach of Fiduciary Duty. Plaintiffs allege GardaWorld breached its fiduciary duty to plan participants by misusing Plan assets and administering a discriminatory plan (including allegedly failing to disclose material Plan information and collecting "unlawful" tobacco and vaccine surcharges). *See* FAC at ¶¶ 66, 68, 72. To establish GardaWorld's liability for breach of fiduciary duty, Plaintiffs are required to show: "(1) the Plan was an employee benefit plan under ERISA; (2) the Defendants were fiduciaries of the Plan; and (3) the Defendants breached their duties under ERISA, resulting in losses to the Plan." *Acosta v. Calderon*, No. CV ADC-16-0964, 2017 WL 4011962, at *4 (D. Md. Sept. 11, 2017); *Stegemann v. Gannett Co., Inc.*, 970 F.3d 465, 468 (4th Cir. 2020) (quoting *Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*, 960 F.3d 190, 195 (5th Cir. 2020)) (a plaintiff must "plausibly allege that a fiduciary breached [a duty], causing a loss to the … plan."). All three elements must be met.

Accordingly, it's not enough to allege individual losses under the Plan. "[A] suit under Section 1132(a)(2) is 'brought in a representative capacity on behalf of the plan as a whole' … and therefore 'does not provide a remedy for individual injuries distinct from plan injuries.'" *Chirinian*, 2025 WL 2147271, at *11 (first quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985); then quoting *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008)); *see Roth v. Sawyer-Cleator Lumber Co.* ("*Roth I*"), 16 F.3d 915, 919–20 (8th Cir. 1994) (explaining that "if individual plan participants suffer losses, but the plan does not, the trustee is not personally liable for damages ....").

It is undisputed that the Plan is an employee benefit plan subject to ERISA regulations. However, even assuming the Court agreed with Plaintiffs that GardaWorld was acting in a

fiduciary capacity (a disputed issue the Court does not resolve), the Court finds Plaintiffs' claim fails because they have not plausibly alleged losses to the Plan, which § 1132(a)(2) requires. *See* 29 U.S.C. §§ 1132(a)(2), 1109(a); *see also Roland v. Jefferson Pilot Fin. Ins. Co.,* No. 1:07CV982, 2008 WL 11483555, at *4 (M.D.N.C. Apr. 16, 2008) (noting the "Supreme Court has held, the 'loss [ ] to the plan' language in section 1109(a) limits claims to those that affect the plan as a whole, rather than those claims affecting only individual plan beneficiaries."). Plaintiffs allege GardaWorld "with[eld] unlawful tobacco and vaccine surcharges from participants' paychecks and us[ed] those funds to reduce its own financial obligations to the Plan," which they claim constituted the use of "Plan assets for [GardaWorld's] own financial advantage in violation of 29 U.S.C. § 1106(a)(1)" and § 1106(b)(1). FAC at ¶¶ 70–71. The claim fails for two reasons.

First, unlike employee wage deductions, The DOL has not regulated whether and when "employer contributions to ERISA funds are plan assets," *W. Virginia Laborers' Pension Tr. Fund v. Owens Pipeline Serv., LLC*, No. 2:10-CV-00131, 2011 WL 5865461, at *2 (S.D.W. Va. Nov. 18, 2011), although informally, it has taken the position that "employer contributions become an asset of the plan only when the contribution has been made." *Acosta,* 2017 WL 4011962, at *5 (citing *Int'l Painters & Allied Trades Indus. Pension Fund v. Clayton B. Obersheimer. Inc.*, No. ELH-12-1000, 2013 WL 594691, at *4 (D. Md. Feb. 13, 2013)). Case law considering the issue has generally determined that "unpaid employer contributions are not assets of a fund [or Plan] unless the agreement between the fund and the employer specifically and clearly declares otherwise."[2] *Id.* (citations omitted). Therefore, Plaintiffs must plausibly allege the Plan language

---

[2] Circuit courts that have considered the issue have adopted the DOL's informal guidance. *See e.g., In re Halpin*, 566 F.3d 286, 290 (2d Cir. 2009)*; In re Bucci,* 493 F.3d 635, 642–44 (6th Cir. 2007); *Bos v. Bd. of Trs.,* 795 F.3d 1006, 1012 (9th Cir. 2015), *cert. denied,* 577 U.S. 1216

provides that unpaid employer contributions are, in fact, Plan assets. They have not and this failure is fatal to Plaintiffs' claims that GardaWorld violated any provisions under 29 U.S.C. § 1106.

Second, whether GardaWorld benefited from a reduced financial obligation to the Plan by depositing the tobacco and vaccine surcharges it collected into the Plan is irrelevant to whether the Plan experienced a loss, which the Court finds Plaintiffs have not plausibly alleged. GardaWorld was free to amend the terms of the Plan and made clear in Plan documents that by collecting the surcharges, it sought to "offset … rising medical costs." FAC at ¶ 30. Offsetting its own costs, without more, does not mean the Plan suffered any harm.

Similarly, although Plaintiffs allege GardaWorld withheld surcharges from Plaintiffs' paychecks and "deposited [them] into its own accounts," FAC at ¶ 37, such an action is permissible because payments do not become Plan assets until "the earliest date on which [they] can reasonably be segregated from the employer's general assets." *Phelps v. CT Enterprises*, 194 F. App'x. 120, 124 (4th Cir. 2006). *See also* 29 C.F.R. § 2510.3-102(c) (establishing that employee contributions under an employee welfare benefit plan become Plan assets not later than 90 days from collection). Because Plaintiffs have not alleged that GardaWorld retained Plan assets beyond 90 days or used the contributions inappropriately (to the detriment of the Plan), this claim also fails.

---

(2016); *In re Luna,* 406 F.3d 1192, 1201 (10th Cir. 2005); *ITPE Pension Fund v. Hall,* 334 F.3d 1011, 1013 (11th Cir. 2003).

    The Fourth Circuit initially took a contrary position in *United States v. Jackson,* stating that "unpaid employer contributions become 'credits' and are ERISA 'plan assets' when they are 'due and payable to the plan,'" but the government later changed its position and petitioned the Supreme Court to vacate the decision and "remand for reconsideration on the basis of the Department of Labor's interpretation that employer contributions don't become plan assets until they have been paid." Acosta, 2017 WL 4011962, at *5 (quoting *United States v. Jackson*, 524 F.3d 532 (4th Cir. 2008), *cert. granted, judgment vacated,* 555 U.S. 1163, (2009)). The Supreme Court did as asked. *Id.* (citing *Jackson v. United States*, 555 U.S. 1163 (2009)). On remand, the "Fourth Circuit vacated and remanded to the district court without expressing any further view on the substantive issue." *Id.* (citing *United States v. Jackson*, 336 F. App'x. 282, 282–84 (4th Cir. 2009)). "The Fourth Circuit has not weighed in on the Department of Labor's interpretation since *Jackson*." *Id.*

Finally, Plaintiffs' remaining allegations, including failing to pay individual participants "the full reward," (which in any event, Plaintiffs do not allege they were themselves entitled to receive); "fail[ure] to properly disclose material information about the wellness programs to participants;" and "administering a Plan that did not conform to ERISA's anti-discrimination requirements;" are all allegations of harm to individual Plan participants, not the Plan itself, and similarly fail. Thus, the Court will grant GardaWorld's Motion to Dismiss as to Count III.

C. <u>Unlawful Imposition of Discriminatory Surcharges (Counts I and II)</u>

As previously explained, GardaWorld may only impose tobacco and vaccine surcharges if its programs comply with all of the requirements of § 2590.702(f)(3)–(f)(4). Plaintiffs assert the Plan's tobacco and vaccine programs: (1) fail to notify participants that personal physician recommendations will be accommodated; (2) omit any notice of RAS availability; and (3) prevent RAS participants from earning the "full reward," by not offering retroactive surcharge refunds. Put another way, Plaintiffs believe by disregarding applicable ERISA statutes and DOL regulations, the Plan does not qualify for an exemption from ERISA and DOL antidiscrimination provisions. Consequently, Plaintiffs contend the Plan is discriminatory and the associated surcharges are unlawful.

*Physician Accommodation Disclosure*

DOL regulations require ERISA wellness plans to include in plan documents describing plan terms, a statement explaining the "recommendations of an individual's personal physician will be accommodated." § 2590.702(f)(3)(v), (f)(4)(v). While plans are not required to include such a statement verbatim, the regulation requires plans to provide notice as part of a RAS that individuals have the option to involve their personal physician. *See* § 2590.702(f)(3)(vi), (4)(vi).

The Court cannot locate any language in the briefs and exhibits provided by the Parties informing Plan participants of the option to involve their personal physician under the RAS. Nor does GardaWorld dispute the allegation or otherwise identify any Plan document containing such language. To impose a tobacco or vaccine surcharge on plan participants without violating ERISA's antidiscrimination rules, GardaWorld must satisfy "*all* of the [regulatory] requirements" of outcome- and activity-based wellness programs under 29 C.F.R. § 2590.702(f)(3), (f)(4). *Chirinian,* 2025 WL 2147271, at *11. As *Chirinian* explained, "[a]ll means all. This is the case no matter how small the requirement may be." *Id.* Because Plaintiffs have plausibly alleged that the Plan does not satisfy "all" of the requirements of § 2590.702(f)(3)–(f)(4), they have also plausibly alleged GardaWorld violated ERISA's antidiscrimination rules by imposing tobacco and vaccine surcharges. Accordingly, the Court will deny GardaWorld's Motion to Dismiss as to Counts I and II.[3]

## V. ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendant's Motion to Dismiss (Doc. No. 20) is **GRANTED** in part and **DENIED** in part as set forth above; and

2. This case shall **proceed toward trial on the merits on the remaining claims** in the absence of a voluntary resolution of the dispute among the parties.

**SO ORDERED ADJUDGED AND DECREED**.

Signed: August 27, 2025

Kenneth D. Bell
United States District Judge

---

[3] Because Counts I and II were plausibly alleged on at least one issue, the Court need not address Plaintiffs' remaining allegations at this stage of the litigation (nor, of course, does it reach any final conclusion on the issue "plausibly alleged").